**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **A.R.,** an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:21-cv-4935 |
| **WYNDHAM HOTELS & RESORTS, INC.;** | ) |
| | ) |
| **G6 HOSPITALITY, LLC;** | ) **JUDGE** _____ |
| | ) Related Cases: 2:19-cv-00849 |
| **AMERICAN HOTEL & LODGING ASSOCIATION;** and | )                 2:19-cv-5384 |
| | ) |
| **OHIO HOTEL & LODGING ASSOCIATION,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**COMPLAINT**

NOW COMES the Plaintiff A.R., complaining as to the conduct of WYNDHAM HOTELS

& RESORTS, INC. ("WYNDHAM"); G6 HOSPITALITY LLC ("G6"); AMERICAN HOTEL &

LODGING ASSOCIATION ("AHLA"); and OHIO HOTEL & LODGING ASSOCIATION

("OHLA" [1]).

---

[1] AHLA and OHLA may hereinafter be referred to collectively as the "Association Defendants."  The remaining
defendants may be referred to as the "Hotel Defendants."

## INTRODUCTION

1.    Human trafficking is the world's fastest growing crime.[2]  The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of **all** illegal drugs.[3]

2.    The covert nature of human trafficking makes it difficult to determine how many victims this trade in human misery has affected, but the International Labor Organization estimates that there are roughly 40 million victims of human trafficking globally, with perhaps hundreds of thousands in the United States.[4]

3.    The American Hotel Industry's apathy towards human trafficking has allowed human trafficking in the United States to flourish.  A recent survey of survivors who called the National Human Trafficking Hotline conducted by the nonprofit Polaris project found that sixty percent (60%) of those who responded had been forced to engage in commercial sex within the confines of a hotel or motel during their trafficking, and a further seventy five percent (75%) had stayed in a hotel or motel during travel or otherwise directly encountered a hotel or motel at some point during their trafficking.[5]

4.    Given the prevalence and profitability of sex trafficking and given the high proportion of sex trafficking that occurs in rooms rented to traffickers by the Hotel Defendants and other members of the hospitality industry for that purpose, the hospitality industry as a whole, and

---

[2] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[3] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order- online/books/WCMS_243391/lang--en/index.htm.

[4] *Global Estimates of Modern Slavery*, INTERNATIONAL LABOR ORGANIZATION (Sept. 19, 2017), http://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf

[5] *On-Ramps, Intersections, and Exit Routes*, POLARIS (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf.

the Hotel Defendants in particular, enjoy significant revenues from their provision of services to the human trafficking industry, likely in the hundreds of millions or billions of dollars per year.

5. Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Hotel Defendants' hotels in particular. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris project created for the use of the hospitality industry. Indeed, attorneys for the hospitality industry acknowledge that eight out of ten trafficking arrests occur in or around hotels.[6]

6. The hospitality industry, speaking through the AHLA, OHLA, and other industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to continuing with business as usual, so that Defendants and all industry participants continue to profit from human trafficking.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this district and because the greater part of the acts and omissions giving rise to the cause of action occurred within this district.

---

[6] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).

9. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act.

10. Pursuant to Southern District of Ohio Local Rule 3.1(b) this case is related to Case No. 2:19-cv-5384 and Case No. 2:19-cv-849 currently pending before Chief Judge Algenon L. Marbley.

## **PARTIES**

11. Plaintiff A.R. is a natural person and a resident and citizen of Ohio.

   a. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C. § 7102(16).

   b. Due to the sensitive and intimate nature of the issues, Plaintiff A.R. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[7]

   c. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[8] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[9] For good cause, the Court may issue an

---

[7] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure. of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[8] Fed. R. Civ. P. 10(a).

[9] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th

[4]

order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[10]

d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[11]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

12.  **Defendant Wyndham Hotels and Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. It is a Delaware corporation with its principal place of business in Parsippany, NJ and can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

---

Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity)

[10] Fed. R. Civ. P. 26(c).

[11] *Supra* n. 2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

13.     Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor.  Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

14.     Wyndham owns, supervises, and/or operates the Super 8® located at 1078 East Dublin-Granville Road, Columbus, OH 43229 and the Hawthorn Suites® located at 6191 Quarter Horse Drive, Columbus, OH 43229.

15.     **G6 Hospitality LLC** ("G6") is a large hotel brand with over 1,400 branded properties in the United States and Canada.  It is a Delaware limited liability company with its principal place of business in Carrollton, TX, and can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.

16.     G6 owns, supervises, and/or operates the Motel 6® located at 6225 Quarter Horse Drive, Columbus, OH 43229 ("Motel 6®").

17.     **Defendant American Hotel & Lodging Association** ("AHLA") "is the largest national association solely representing all segments of the 8 million jobs the U.S. lodging industry supports, including hotel owners, REITs, chains, franchisees, management companies, independent properties, bed and breakfasts, state hotel associations, and industry suppliers… [and] proudly represents a dynamic hotel industry of more than 54,000 properties that supports $1.1 trillion in U.S. sales and generates nearly $170 billion in taxes to local, state and federal governments."[12] It is a Delaware corporation with its principal place of business in Washington, D.C. and can be served through its registered agent, Incorp. Services, Inc., at 919 N. Market Street, Suite 950, Wilmington, DE 19801.

---

[12] https://www.ahla.com/press-release/northstar-travel-group-acquires-leading-group-hotel-investment-events-burba-hotel

18.     **Defendant Ohio Hotel & Lodging Association** ("OHLA") "provides advocacy, information, resources, and education for operators and professionals in every type of lodging business across the state of Ohio. OHLA supports efforts to grow Ohio's travel economy, to provide jobs for hospitality professionals, and to maintain a prosperous hotel and lodging market."[13] It is an Ohio corporation with its principal place of business in Columbus, OH and can be served through its registered agent, Joseph Thomas Savarise, at 175 S. Third Street, Suite 170, Columbus, OH 43215.

## FACTUAL BACKGROUND

### INTRODUCTION

19.     This case brings claims against major hotel brand corporations for conspiracy, and violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA").

20.     The vast majority of commercial sex trafficking transactions occur within the hospitality industry. Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, Huffington Post, July 22, 2015, *available at* https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited October 14, 2019).

21.     The hospitality industry is controlled by a small number of powerful corporations, ("Hotel Industry Leaders") with a handful of companies owning well over 90% of hotel and motel properties. The chart below lists the largest Hotel Industry Leaders by number of properties.

---

[13] https://ohiolodging.com/aws/OHLA/pt/sp/mission



22.     Defendants in the instant case include Hotel Industry Leaders and trade associations that were led by these Hotel Industry Leaders including the Hotel Defendants named herein.

23.     The TVPRA prohibits Hotel Defendants from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in what they know or should know involves a trafficking venture.

24.     Indeed, human trafficking in hotels is a top-down problem in the hospitality industry, and Hotel Industry Leaders like the Association and Hotel Defendants are in the best

position to, and have a duty and responsibility, to set policies and procedures to combat human trafficking and comply with the TVPRA.

25.     As the voice and image of the hotel industry, all defendants[14] by association have a duty and responsibility to form a first line of defense against human trafficking in the hotel industry.  Instead, All Defendants collaborated and hired media professionals making public claims to investors and customers to "address" the longstanding problem of human trafficking at hotels rather than engaging experts in human trafficking and security to train hotel staff and implement mandatory and effective anti-human trafficking policies and protocols.

26.     The Associations and Hotel Defendants herein, and thereby the entire hospitality industry, have utterly failed to take the actions needed to combat the known scourge of human trafficking.

27.     Instead of taking reasonable steps to combat human trafficking in the hotel industry and thereby complying with their duties under state and federal law,  defendants conspired together to ensure they would save money related to compliance with the TVPRA and continue to profit millions of dollars from the trafficking occurring on their branded properties.

28.     Hotel Defendants conspired together with industry trade associations to perpetuate a false narrative absolving Defendants from responsibility of the human trafficking taking place within the hotel industry. As such, these industry leaders individually and collectively advertised their condemnation of human trafficking, all the while jointly saving all costs associated with compliance with the TVPRA's non-delegable duty.

29.     As part of their conspiracy to save costs and continually reap millions of dollars in profits, the Hotel Industry Leaders failed to develop mandatory and comprehensive training to

---

[14] All defendants may collectively be referred to as "All Defendants."

prevent human trafficking, failed to implement training to prevent human trafficking, and failed to conduct audits confirming that training had been implemented and that human trafficking occurrences were being prevented on hotel properties. The Hotel Industry Leaders further failed to enact robust policies and practices to ensure continuous, directed action to combat human trafficking on their properties.

30.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

31.     Plaintiff's injuries are indivisible.

32.     The TVPRA provides for joint and several liability.

<strong>THE SEX TRAFFICKING OF PLAINTIFF A.R.</strong>

33.     A.R. first met her traffickers in 2009, when she was just 20 years old.

34.     By means of a combination of violence, threats, induced dependence on illegal substances, and induced dependance for provision of basic survival necessities such as, but not limited to, food, transportation, shelter, and clothing, A.R. was held captive and sold for sex by her traffickers approximately from 2009 through 2015.

35.     During the time that she was trafficked, A.R.'s traffickers frequently rented rooms at the Hotel Defendants' hotel locations because such rooms provided convenient, anonymous, and relatively central locations to which they could invite "johns" for the purpose of forcing A.R. to have sex with those "johns" for money.

36.     Throughout her trafficking, A.R.'s traffickers connected with "johns" willing to abuse A.R. for money by posting or causing to be posted entries on www.craigslist.com and www.backpage.com advertising A.R.'s availability for commercial sex.

37.     A.R. was sold to, and forced to have sex with, as many "johns" as necessary to enable her traffickers to profit at least $300.00 every night.

[10]

38.     Over the course of roughly six years, A.R.'s traffickers rented rooms at, and forced her to have sex for money within, at least the following hotels:

      a.     Motel 6® at 6225 Quarter Horse Drive, Columbus, Ohio 43229;

      b.     Super 8® at 1078 East Dublin-Granville Road, Columbus, Ohio 43229 and;

      c.     Hawthorn Suites® at 6191 Quarter Horse Drive, Columbus, Ohio 43229;

39.     During the time she was trafficked, A.R.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals, including the hotels just listed.

40.     While at the Hotel Defendants' hotels, A.R.'s traffickers threatened and administered physical violence to ensure that she could not escape.

41.     During her many stays in the Hotel Defendants' hotels, including at the locations just listed, A.R. was subjected to rape, frequent physical and verbal abuse, malnourishment, psychological torment, kidnapping, and false imprisonment all the while hotel employees and managers allowed her trafficking.

42.     At the hotels just listed, A.R. encountered hotel staff on multiple occasions.  Such staff would have seen the signs of A.R.'s desperate situation brought on by the abuse perpetrated by "johns" and her traffickers.

43.     For example, at the Motel 6® on Quarter Horse Drive, A.R. was on one occasion subjected to physical abuse by a "john" and was on another occasion chased through the halls of the hotel by her trafficker, who had been enraged by a suspicion that she had attempted to escape.

44.     Similarly, at the Super 8® on East Dublin-Granville Road, A.R.'s trafficker and a "john" got into a fight.  A.R. called the front desk, and a hotel employee arrived to break up the fight.  During this altercation, A.R. fled the hotel and, with snow on the ground, and attempted to

walk to safety.  Unfortunately, her trafficker was able to catch her and forcibly return her to the Super 8® without any interference by the hotel's staff.

45.     Notably, this Super 8® also had a policy of permitting check-in without the provision of a photo ID for an additional fee.

46.     While at the Hotel Defendants' hotels, A.R.'s traffickers did not permit her to be alone.  Her traffickers held onto her cell phone nearly all of the time and constantly monitored her to ensure she could not attempt to escape.

47.     At least one of A.R.'s traffickers regularly requested that hotel staff notify him should A.R. attempt to leave the hotels' premises.  This resulted in the prevention and/or thwarting of escape attempts by A.R.

48.     Each "john" whom A.R. was forced to have sex with entered the Hotel Defendants' properties as a nonpaying guest and would routinely leave within hours of arrival.  The foot traffic to the rooms rented by her traffickers was constant and conspicuous.

49.     A.R.'s traffickers followed a routine procedure during stays at the Hotel Defendants' hotels, which resulted in several consistent red flags, including:

  a.  excessive requests for towels and linens;

  b.  cash payments for rooms;

  c.  extended stays paid for on a day-by-day basis;

  d.  unusually large numbers of used condoms left in the trash;

  e.  obvious signs of illegal drug use;

  f.  unusually large number of male visitors going in and out of A.R.'s rooms;

  g.  unusually large number of persons switching back and forth between multiple rooms; and

      h.   unusually large number of male visitors asking for A.R. at the front desks.

50.    Despite this abundance of available evidence of A.R.'s captivity and abuse, A.R. received no assistance from any employee of any Defendant, and the Hotel Defendants continued to repeatedly rent rooms to her traffickers.

51.    The impact of being physically and emotionally abused, falsely imprisoned against her will, and sex trafficked at the Defendants' hotel properties has forever psychologically and physically injured A.R. who, despite the many years since her escape suffers immensely as a result of the horrors inflicted upon her at the Hotel Defendants' hotels.

52.    Had the Hotel Defendants not hewed to a common policy of harboring known and suspected human traffickers in exchange for financial benefit, A.R.'s traffickers likely could not have successfully arranged the commercial sex transactions that were the reason underlying A.R.'s continued captivity.

53.    Had the Hotel Defendants not hewed to a common policy of actively ignoring signs of ongoing human trafficking, the open and obvious signs of A.R.'s sex trafficking would likely have resulted in a far earlier reporting of her traffickers and thus in a far earlier end to her victimization.

54.    A.R.'s injuries are thus the direct and proximate result of the Hotel Defendants' maintenance of policies and procedures that they knew or should have known incentivized their employees to ignore the obvious signs of human trafficking, and even to rent rooms to known or suspected human traffickers, while, they continue to profit from sex trafficking.

55.    This action follows.

**BRAND HOTEL DEFENDANTS' CONTROL OVER THEIR HOTEL LOCATIONS**

[13]

56.     Upon information and belief, it is a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served to the number of pillows that shall be placed on each bed, types of funds accepted, and when, where, and how guests should be greeted.

57.     The Hotel Defendants provide to their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

58.     Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants.

59.     Upon information and belief, per the relevant franchise agreements, the Hotel Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

60.     Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

61.     It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

62.     The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

63.     On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

64.     Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

65.     Specifically, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

66.     Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

67.     On information and belief, the Hotel Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

**HOTEL DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTEL LOCATIONS**

68. The Hotel Defendants are and have long been on notice of repeated incidences of sex trafficking occurring at their hotel locations thanks, in part, to the copious publicly available evidence regarding the high prevalence of sex trafficking at hotels.

69. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

70. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign. These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

71. The Hotel Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Hotel Defendants nevertheless do not share such information

[16]

with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

72. The Hotel Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

73. The Hotel Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

74. The Hotel Defendants have access to public outcries on platforms such as Twitter that garner support for initiatives, such as petitions on Change.org.

75. A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Hotel Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

a. In June 2014, the city of Columbus, OH, obtained a temporary restraining order shutting down a Super 8 hotel in that city after investigating and substantiating complaints of rampant drug activity and prostitution.

b. Regarding a 2019 stay at a Super 8 in Columbus, OH, a hotel customer wrote a review saying, "Absolutely do not recommend…Shouting fights, people trying to break windows, hookers, and overflow from a local homeless shelter…"

[17]

c.      Regarding a 2019 stay a Super 8 in Columbus, OH, a hotel customer wrote a review saying, "I've probably stayed in worse but I can't remember when. Scary, scary, scary!! Drug dealers and prostitution rampant all night long. Kept imagining what the room would look like with a black light."

d.      Regarding a 2018 stay at a Super 8 in Columbus, OH, a customer stated, "The area is sketchy, we were actually afraid to leave our room because of the human beings walking around that place. When we checked out we left in a hurry to avoid being robbed or shot…Don't stay here unless you plan on buying a hooker and doing some blow and meth."

e.      In August 2018, law enforcement arrested several persons in connection with human trafficking in a Wichita, Kansas Super 8.

f.      Regarding an August 2019 stay at Hawthorn Suites in Columbus, OH, a customer wrote a review titled "Stay away!!!" and further explained. "Wouldn't recommend to a adult. If you into drugs and prostitution then this place is for you!!"

g.      Regarding a July 2018 stay at a Hawthorn Suites in Columbus, OH, a customer wrote a review stating, "terrible hotel…security present, would appear to be more of a hourly hotel prostitues/drugs etc couldnt stay, demanded refund and changed hotel to one actually at airport newer/Safer etc".

**G6**

a.      In February 2020, the Columbus, OH city attorney's office filed objections to the renewal of three motels' licenses, including to a Motel 6 in the city, citing a pattern of drug and prostitution activity, human trafficking, and gang activity.

[18]

b.     In January 2021 police from Sunnyvale, CA responded to a call to investigate reports of a woman screaming for help at a Motel 6 and eventually arrested three human traffickers as they attempted to escape.

c.     Regarding a 2009 stay at a Motel 6 in Dothan, Alabama, a customer wrote a review entitled, "Not so bad- If you like crack prostitutes" and explained, "This Motel 6 was horrifying. We turned down the blankets to discover dirty panties in the bed, and there was wadded up toilet paper strewn about one side of the bed and all over the bathroom. As an added bonus we got phone calls in the middle of the night asking for sexual favors."

d.     Regarding a 2014 stay at a Motel 6 in Van Nuys, CA a customer stated, "Myself Husband and Children…were in need of a room...I was looking for rooms on the internet I called one of the numbers to find a room so we booked it with Motel 6… So finally we get the room keys after waiting an hour we get into the dirty nasty elevator OH LET ME REMIND YOU ABOUT THE NASTY PROSTITUTES WALKING THROUGH THE HALLS! overall this place is worse then DISGUSTING and needs to be close down!!!!!"

### DEFENDANTS' "UNIFIED COMMITMENT" TO HARBORING HUMAN TRAFFICKERS

76.    The Hotel Defendants and other major hotel chains, acting together with and through the Association Defendants have long engaged in a coordinated campaign to divert negative attention and preserve the profits the industry derives from its regular provision of accommodation to human traffickers, thereby ensuring that each industry participant remain complacent and rent rooms to human traffickers with roughly the same frequency as its peers.

[19]

77.     Defendants and other AHLA members have arrived at an understanding, whether explicit or tacit, that it is in the financial interests of the industry as a whole for all of its members to refrain from taking concrete, meaningful steps identify human trafficking at their locations, and to prevent the rental of rooms for the purpose of human trafficking.  This is because:

a.      Defendants and other AHLA members understand that human trafficking is a significant revenue source for the industry as a whole, and that a substantial decrease in the patronage of hotels by human traffickers would harm the industry;

b.      Defendants and other AHLA members also understand that if any individual Hotel Defendant or other major chain were to take concrete, meaningful steps to combat human trafficking, that entity would bear significant initial training and compliance costs, but would thereafter experience a significant, if temporary, competitive advantage resulting from its ability to advertise both its own actions and the utter failure of its competitors do likewise;

c.      Defendants and other AHLA members understand that any such competitive advantage would be temporary because other industry participants would be compelled, in order to stay competitive, to follow suit in taking such concrete, meaningful steps; and

d.      Defendants and other AHLA members understand that this would have the effect of closing human traffickers out of the hotel industry and significantly decreasing the prevalence of human trafficking generally, thereby decreasing the profits of all industry participants.

      e.    Upon information and belief, Association and Hotel Defendants are aware of public and private investors' criteria for valuing a company, including risks and liabilities for litigation, including company director's compliance with TVPRA.

78.    Defendant AHLA is the sole national association representing all segments of the U.S. lodging industry, and all Hotel Defendants are represented on its Board of Directors, while OHLA is an associate.  On information and belief, all Defendants were members or associates of, and held leadership roles in, the AHLA during the period from 1993–2016.

79.    On information and belief, all Hotel Defendants are members of OHLA.  On information and belief, they were also members of and represented in the leadership of OHLA during the period from 1993–2016.

80.    Defendants are far from shy about the fact that the hotel industry acts in concert, through the auspices of the AHLA, with respect to its response to human trafficking.  Indeed, they have recently taken to trumpeting this fact from the rooftops.  For example:

      a.    In September 2018, the AHLA issued a press release touting the recent public commitments of the CEOs of Wyndham and several other major industry players, as well as, on information and belief, of senior representation of the remaining Hotel Defendants, to take certain limited steps to combat human trafficking as "an unprecedented show of unity within a fiercely competitive industry."

      b.    In June 2019, the AHLA issued a press release announcing its new "No Room for Trafficking" initiative entitled "Hotel Industry Unites on New Campaign to Fight Human Trafficking."

[21]

       c.     In July 2019, the AHLA began running a commercial entitled "Unity," in which the narrator states, "We're taking a unified industry approach to save lives."

       d.     The AHLA webpage for that initiative currently advises industry participants that "Another way that your hotel can raise awareness with guests is through social media posts that highlight our industry's unified commitment to preventing human trafficking in hotels."

81.     The Hotel Defendants and other industry members, acting through the AHLA, have thus voiced a unified determination to ensure that all employees are trained to recognize human trafficking and have access to the National Human Trafficking Hotline's telephone number.

82.     But the behavior of the Hotel Defendants and other AHLA members demonstrates that this "unified commitment" to a sharply limited training regimen represents an agreed-upon false standard for their individual efforts to combat human trafficking, rather than implementing meaningful change.

83.     The actual number of employees trained under the "No Room for Trafficking" program and all prior initiatives relating to human trafficking is paltry. On information and belief, less than half of current front desk employees at each Hotel Defendants' respective locations have been trained to recognize human trafficking.

84.     This despite AHLA's then-Vice-President for Government Affairs stating in 2017 that while "[t]he cost of training varies . . . it's definitely not burdensome."

85.     Moreover, on reference and belief, nowhere in any of the trafficking-related materials promulgated through the auspices of the AHLA is any suggestion that the Hotel Defendants will or should take key actions that would doubtlessly reduce human trafficking, such

as: (1) mandating—as opposed to allowing for—their employees report suspected traffickers; or (2) forbidding their employees from renting rooms to known or suspected human traffickers.

86.     On information and belief, no Hotel Defendant, nor any other major industry participant, requires training regarding human trafficking for all employees likely to encounter human trafficking, nor did any do so during the time Plaintiff was trafficked.

87.     On information and belief, no Hotel Defendant has or had issued a policy requiring employees to report suspected instances of human trafficking.

88.     On information and belief, no Hotel Defendant has or had issued a policy forbidding employees from renting rooms to known or suspected human traffickers.

89.     On information and belief, no Hotel Defendant has taken any other significant action to combat human trafficking that was not directly called for by the industry as a whole through the auspices of the AHLA.

90.     In sum, the behavior of the Hotel Defendants demonstrates at least a tacit "unified commitment" not to go rogue—and hurt the industry as a whole—by enacting mandatory policies that might have a meaningful effect on human trafficking.

91.     On June 29, 2019, the AHLA held a strategic roundtable "bringing together industry leaders, government partners . . . to underscore the industry's efforts around human trafficking." On information and belief, senior leadership of each Hotel Defendant, who are on AHLA's board of directors, participated in this roundtable under the heading of "industry leaders."

92.     On information and belief, during these discussions, senior leadership for all Hotel Defendants collectively rejected that possibility, thereby demonstrating and reinforcing their preexisting common understanding that recommending, let alone taking, further steps would be detrimental to the industry as a whole.

93.     On April 22, 2015, AHLA issued an earlier set of guidelines on human trafficking substantially similar to its "No Room for Trafficking" campaign.

94.     In addition to acting together on a national level through the AHLA, the hotel industry has acted together through its state organizations, including OHLA, in support of the same goals, namely touting a focus on certain limited training while preventing discussion of any mandatory action that might actually respond to, identify, and ultimately prevent human trafficking.

### CONSPIRACY AMONGST MAJOR HOTEL BRANDS

### OHIO IS AN EPICENTER FOR TRAFFICKING AND A PROFIT-CENTER FOR DEFENDANTS.  ACCORDINGLY, DEFENDANTS' CONSPIRACY TO VIOLATE THE TVPRA WAS AIMED AT, FOCUSED ON, FURTHERED WITHIN, AND HARMED RESIDENTS OF OHIO

95.     The Defendants aimed their conspiratorial conduct at the State of Ohio where trafficking is rampant and access to the rest of the country is available through highways. By ensuring a high trafficking volume in states like Ohio, Defendants were able to continue making millions of dollars from trafficking ventures every year.

96.     Ohio is an epicenter of human trafficking for the country. Ohio serves as the logistical hub for trafficking, feeding victims and traffickers into distant corners of the country.

97.     Traffickers find Ohio particularly attractive because it has both large urban centers and rural counties; a sizable transient and immigrant population; and five major highways with easy access to other states and Canada. *See* Christen Johnson, Maggie Rechel, and Therese Zink, MD, MPH, *Yes, Virginia, Sex and Human Trafficking are Problems in Ohio*, The Ohio Family Physician, Spring 2015, *available at* https://medicine.wright.edu/sites/medicine.wright.edu/files/uploads/0/article/Human-Trafficking-Problems-in-Ohio.pdf ("The location of Ohio's I-70 and I-75 corridors is ideal for human and

sex trafficking. The FBI has named Toledo, OH as the fourth worst city in the country for such trafficking.").

98.     Human trafficking "is a pervasive crime that touches every region of the state with its destructive acts of injustice, devastating the lives of those impacted in Ohio's cities, suburbs and rural communities." *Ohio Human Trafficking Task Force Report 2019*, Ohio Human Trafficking Task Force, January 2015 at 5, *available at*

https://humantrafficking.ohio.gov/OhioHumanTraffickingTaskForceReport0119.pdf.

99.     Victims are recruited for many reasons, but two significant reasons are Ohio's proximity to Canada and the interstates running through Ohio that connect many urban communities across rural landscapes. The victims are recruited, hidden in less populated areas, and then transported across state lines. *See*

https://medicine.wright.edu/sites/medicine.wright.edu/files/uploads/0/article/Human-Trafficking-Problems-in-Ohio.pdf.

100.    Defendant hotels, through their conspiracy to do nothing, continued to have Ohio as a profit center, where traffickers rented rooms for the purpose of commercial sex trafficking.

101.    OHLA has held multiple meetings and seminars in Ohio, wherein human trafficking has been announced as the topic, yet they have avoided meaningful steps to eradicate trafficking.

102.    Additionally, the common plan of failing to implement safeguards to detect and prevent trafficking on the part of Defendants and all major hotel industry players has a significant nexus to Ohio:  a. On information and belief, all major decisions relating to Red Roof Inn's support of and subsequent compliance with AHLA and other industry "anti-human trafficking" efforts were taken in New Albany, Ohio. b. All Hotel Defendants, in furtherance of the common scheme,

have advertised and rented rooms at their locations in Ohio to human traffickers, c. All Hotel Defendants have exercised control over their local Ohio properties, maintaining that local brand properties follow corporate policies that permit and allow for profits to be derived from human trafficking.

103.    Hotel Associations join together and even file lawsuits on behalf of hotel members when it finds legislation harmful to the industry due to mandated actions that would impact their bottom line. The AHLA has unified the industry to "voluntarily" take the actions it wishes even with clear safety concerns for employees and guests.

104.    OHLA and AHLA regularly coordinate including on the topic of human trafficking in the hospitality industry.

105.    Defendants collectively through AHLA and OHLA took actions that appeared to be in the best overall interest of their hotel industry members, while refusing to engage in activities that would prevent and safeguard instances of sex assault on hotel properties.

106.    For example, AHLA and OHLA fought against having emergency buttons for housekeeping even after many reported instances of sexual assault.

107.    Moreover, AHLA, OHLA, and Defendant Hotels, when initially offered, declined or refused to allow soap products to be offered in their venues that provided human trafficking awareness information on the bars.

108.    OHLA and AHLA exist to benefit hotels and the bottom line of their business. The associations are not formed to protect employees or the public.

109.    On or about October 23, 2020, OHLA and AHLA, held a virtual roundtable discussion specifically regarding human trafficking in Northeast Ohio for Ohio Congressman Dave Joyce and other community members.

[26]

110.    OHLA regularly discusses litigation threats to the Defendants and the hotel industry, including trafficking. *See* Anti-Human Trafficking Event, *available at* https://www.ohiolodging.com/aws/OHLA/pt/sd/calendar/201093/_PARENT/layout_details/fals; *see also* https://www.pcma.org/event/the-fight-against-human-trafficking-with-ohlas-joe-savarise/.

111.    According to their publicly available information, OHLA's trafficking focus consists primarily of offering training sessions and public awareness events. A major push of their public image is raising money and awareness of trafficking related charities.

112.    OHLA and Defendants engaged in lobbying efforts in Ohio to influence and oppose legislation that would require the hospitality industry to engage in trafficking related compliance.

113.    Defendants over the course of decades rented thousands of rooms to traffickers and victims, and Defendants profited from those rented rooms. While Hotel Defendants continued policies that permitted renting rooms to traffickers in Ohio, all Defendants took acts to appear as if they were responding, in furtherance of the conspiracy to avoid customer reprisal, government regulation, and compliance with the TVPRA.

114.    Defendants desire to keep Ohio as a profit center for Hotel Defendants and allowed for – the continuation of trafficking in all states where Association Defendants had influence, power, and/or control over professional hotelier networks, government officials, and public opinion. es.

## CAUSES OF ACTION

### COUNT I: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

115.    Plaintiff incorporates each foregoing allegation.

116.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a)

and is entitled to bring a civil action under 18 U.S.C. §1595.

117. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, to engage in violations of the TVPRA. At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of Plaintiff for the purposes of commercial sex induced by force, fraud, or coercion.

118. Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the demand and supply side of sex trafficking and limiting mandatory regulations. Moreover, Defendants directly benefitted from the sex trafficking of Plaintiff on each occasion they received payment for rooms or received payments or kickbacks for internet usage. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of Plaintiff's injuries and damages.

119. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

### COUNT II: CONSPIRACY TO VIOLATE THE TVPRA
### (AGAINST ALL DEFENDANTS)

120. Plaintiff incorporates each foregoing allegation.

121. At all relevant times, the Defendants knowingly agreed, contrived, confederated, and acted in concert, aided and abetted and/or conspired to continue their longstanding practice of renting rooms to known and suspected human traffickers, long after the enactment of § 1595 rendered it illegal for them to profit from the same.

122. For over a decade, upon information and belief, Defendants, individually, jointly,

[28]

and in conspiracy with each other as key leaders in the hotel and lodging industry and through common understanding and design, implemented a malicious, sophisticated, and deceptive two-pronged strategy to profit from ventures that they knew or should have known violated the TVPRA as described above.

123. First, Defendants promoted themselves and their industry as dedicated opponents of human trafficking.

124. Second, Defendants, pursuant to either an explicit agreement or at least an implicit understanding, each maintained and continues to maintain policies, procedures, and training protocols that they know create environments at their branded hotel locations in which it is understood and accepted that rooms shall be rented to known and suspected human traffickers and profit shall be derived therefrom.

125. Defendants control nearly every aspect of operations, including employee management, at their branded hotel locations through a web of franchise agreements and brand quality standards.

126. The staffing decisions at the individual hotel locations are sufficiently controlled by the Hotel Defendants as to render staff at those locations' agents and joint employees of the brand manager Defendants and the individual hotel locations. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

127. The staff at individual locations, including the locations at which Plaintiff was trafficked, took affirmative action, as agents of the brand manager Defendants, to provide lodging to individuals who the staff and the brand manager Defendants knew or should have known were engaged in human trafficking.

128. The staff took these actions in compliance with a set of policies, procedures, and

[29]

training protocols created, and subsequently maintained with few changes, by Defendants in the full knowledge that—and, upon information and belief, with the intent that—such policies, procedures, and training protocols would ensure that human traffickers continued to do business at Defendants' branded hotel locations so as to generate profit for Defendants.

129.    Moreover, upon information and belief, despite the overwhelming data possessed by and available to the Defendants, Defendants individually, jointly and in conspiracy with each other willfully and maliciously used their influence, through the AHLA and OHLA, over local, state and federal agencies to restrict the disclosure of and otherwise to mask material facts about the prevalence of human trafficking and the hotel industry's failure to act regarding the same.

130.    As co-conspirators, Defendants are jointly and severally liable for Plaintiff's trafficking at every property.

131.    Defendants' conspiracy to maintain profits for Hotel properties, with the least amount of regulation resulted in a pattern of practices, policies, and procedures that allow Defendants' to financially benefit from unlawful commercial sex ventures in violation of the TVPRA caused injury to Plaintiff and other victims.

132.    Defendants' conspiracy kept Hotel Defendants, who knew or should have known about human trafficking at their properties from taking meaningful action resulting in significant injuries to Plaintiff and additional victims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

   a.   Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages,

including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated:  October 2, 2021

Respectfully submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr. (0093584) **Babin Law, LLC**
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
T: (614) 761-8800
E: steven.babin@babinlaws.com


/s/ Jennifer J. El-Kadi
Jennifer J. El-Kadi (*pro hac vice forthcoming*)
OH Bar No. 100660
**Babin Law, LLC**
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
T: (614) 761-8800
E: jennifer.elkadi@babinlaws.com

[31]

/s/ Kimberly Lambert Adams
Kimberly Lambert Adams (*pro hac vice forthcoming*)
Kathryn L. Avila (*pro hac vice forthcoming*)
Chris V. Tisi (*pro hac vice forthcoming*)
Emmie Paulos (*pro hac vice forthcoming)*
**Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr & Mougey, P.A.**
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850.435.7056
F: 850.436.6056
E: kadams@levinlaw.com /
kavila@levinlaw.com/ ctisi@levinlaw.com /
epaulos@levinlaw.com

/s/ Gregory M. Zarzaur
Gregory M. Zarzaur (*pro hac vice forthcoming*)
**ZARZAUR Law Firm**
2332 2nd Avenue North
Birmingham, Alabama  35203
T: 205.983.7985
F: 888.505.0523
E: gregory@zarzaur.com